IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| C.D., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION FILE |
| | )   NO. |
| LINCOLN HOTELS, LLC; DAYS | ) |
| INNS WORLDWIDE, INC.; and | ) |
| WYNDHAM HOTELS & RESORTS, | ) |
| INC., | ) |
| | ) |
|     Defendants. | ) |

## **COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff in the above-styled action and hereby files her

Complaint as follows:

1.

This case involves the sex trafficking of a child.  Given the nature of the

case, C.D. is identified in this Complaint only by generic initials to prevent public

disclosure of C.D.'s name.  Plaintiff's counsel has either previously disclosed

C.D.'s full name to defense counsel or will immediately upon identification of

additional counsel.  Upon information and belief, all parties consent to proceeding by using C.D.'s initials.[1]

## PARTIES, JURISDICTION, AND VENUE

2.

C.D. is a citizen of the United States of America, is a resident of the State of Texas, and consents to the jurisdiction of this Court. C.D. was born in May of 2001 and was a minor at the time of her sex trafficking.

3.

At all times relevant to this complaint, Defendants Lincoln Hotels, LLC ("Lincoln Hotels"), Days Inns Worldwide, Inc. ("DIW"), and Wyndham Hotels & Resorts, Inc. ("Wyndham"), (collectively, "Defendants") owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the Days Inn by Wyndham located at 2191 Northwest Parkway, Marietta, Georgia, 30067 ("Days Inn"), from which they benefited financially.

---

[1] Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include sex trafficking of a minor child, are intimate and personal in nature, as well as for C.D.'s own personal safety.

4.

Lincoln Hotels is a Georgia limited liability company with its principal place of business at 2191 Northwest Parkway, Marietta, Georgia, 30067. Service can be made on Lincoln Hotels by serving its registered agent: C. Samir Patel, 990 Hammond Drive, Suite 800, Atlanta, Georgia, 30328.

5.

Jurisdiction and venue are proper as to Lincoln Hotels, and Lincoln Hotels was properly served with process in this action.

6.

DIW is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 22 Sylvan Way, Parsippany, New Jersey, 07054. Service can be made on DIW by serving its registered agent: Corporate Creations Network, Inc., 2985 Gordy Parkway, 1st Floor, Marietta, Georgia, 30066.

7.

Jurisdiction and venue are proper as to DIW, and DIW was properly served with process in this action.

8.

Wyndham is a Delaware corporation with its principal place of business at 22 Sylvan Way, Parsippany, New Jersey, 07054. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions within Georgia, resulting in injuries in Georgia. Service can be made on Wyndham by serving its registered agent at 811 Church Road, #105, Cherry Hill, NJ 08002.

9.

Jurisdiction and venue are proper as to Wyndham, and Wyndham was properly served with process in this action.

10.

This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C. 1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims form part of the same case or controversy as her federal law claims.

11.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this

4

action occurred in Cobb County, Georgia, within the Northern District of Georgia, Atlanta Division.

## THE PARTIES' ROLES

12.

At all times relevant hereto, Lincoln Hotels owned, operated, maintained, controlled, and managed the Days Inn.

13.

DIW is the franchisor of the Days Inn brand and is a provider of guest lodging facility services, including at the Days Inn.

14.

In exchange for a percentage of the revenue from room rentals at the Days Inn, including the rooms in which Plaintiff was trafficked, DIW controls, manages, and operates the Days Inn.

15.

Wyndham is the world's largest hotel franchisor. In exchange for a percentage of the revenue from room rentals at the Days Inn, including the rooms in which Plaintiff was trafficked, Wyndham controls, manages, and operates the Days Inn.

16.

DIW and Wyndham are joint venturers who control the operation of the Days Inn. DIW and Wyndham are interrelated companies that share principal places of business, share employees, jointly own the data derived from the operation of the Days Inn, share funds generated by the Days Inn, and have rights of mutual control over the Days Inn and each other.

17.

DIW and Wyndham set the pricing of room rates at the Days Inn, continuously monitor real-time competitor pricing data, and make pricing decisions for each individual hotel, including the Days Inn. Continuously changing the price of hotel rooms is an essential function of the day-to-day operation of the Days Inn and is controlled by DIW and Wyndham.

18.

DIW and Wyndham accepted and ratified the conduct of Lincoln Hotels and its employees, agents, and representatives as alleged herein.

19.

DIW and Wyndham jointly control the day-to-day operations of the Days Inn. DIW enters into contracts with franchisees, including Lincoln Hotels, that incorporate and bind Lincoln Hotels to many other documents, contracts, and

programs, some of which are in turn controlled by Wyndham. These contracts and programs include the Franchise Agreement, System Standards Manual, Wyndham Rewards Front Desk Guide, Wyndham Rewards Program, and Worldwide Sourcing Solutions Approved Supplier Program, among others, which provide *mandatory* policies, procedures, and operational practices that control nearly every aspect of the Days Inn's daily operation. These documents are collectively referred to as the "Franchisor Contracts."

20.

Together, DIW and Wyndham jointly control, among many other hotel functions at the Days Inn, employee and management training and supervision; employee interaction with guests at the hotel; all food, supplies, products, and amenities available in the hotel; the hotel's online reputation management; and guest reservation and booking, including check-in and check-out, rates and room inventory, front desk record-keeping, and other essential tasks.

21.

Through the Franchisor Contracts, DIW and Wyndham impose hundreds of mandatory requirements and prohibitions on Lincoln Hotels. The more detailed System Standards imposed on Lincoln Hotels are not suggestions. The Franchisor Contracts provide that Lincoln Hotels "must participate in and comply with the

terms of all mandatory marketing, reservation, advertising, promotion, rate and room inventory, discount, training and operations programs" and that "any breach of System Standards for this Facility, its guest amenities, and your guest service performance is a material breach of this Agreement."

22.

Through the Franchisor Contracts, DIW requires Lincoln Hotels to submit to the daily control of Wyndham by requiring compliance with the Wyndham Rewards Front Desk Guide, and Wyndham's property management systems, guest programs, and central reservation platform. These programs dictate what hotel staff say to every hotel guest on a daily basis. Employees of Lincoln Hotels are required by DIW and Wyndham to enroll guests in certain programs, which in turn control the daily price and availability of rooms at the Days Inn.

23.

Lincoln Hotels' employees must comply with the terms of the Franchisor Contracts and the numerous policy documents referenced therein. For example, the Wyndham Rewards Front Desk Guide "sets forth additional system standards, which [Lincoln Hotels] agree to follow."

24.

Wyndham's Wyndham Rewards Front Desk Guide also requires Lincoln Hotels' employees to submit to additional training and to promote, manage, and operate the Wyndham Rewards program for the benefit of Wyndham. Wyndham reaps valuable guest data and increased profits from the program for Wyndham as a whole, as well as DIW and the Days Inn brand. If Lincoln Hotels' employees do not operate the program to Wyndham's satisfaction, Wyndham imposes monthly fines on Lincoln Hotels.

25.

DIW and Wyndham jointly train Days Inn employees through the Wyndham Hotel Group's School of Hospitality Operations. According to the Franchise Contracts, this training is mandatory. Lincoln Hotels' employees "must complete all mandatory training programs to our satisfaction."

26.

DIW and Wyndham conduct mandatory training of every Days Inn general manager through their Strategic Training for Exceptional Performance program which covers every aspect of the hotel's operation and includes further mandatory requirements the hotel and its staff must abide by. At their option, DIW and Wyndham may require franchisees to pay for further mandatory remedial training

from DIW and Wyndham if the hotel scores poorly on the meticulously tracked online reviews or receives "poor guest feedback on electronic or paper based guest satisfaction surveys (for example, TripAdvisor), or if we receive significant complaints to our guest service department, as we determine in our discretion."

27.

DIW and Wyndham require franchisees, including Lincoln Hotels, to train every hotel employee "as and when required by the System Standards" and the Franchisor Contracts. DIW and Wyndham require Lincoln Hotels to pay for DIW's and Wyndham's e-learning modules with even more mandatory training from DIW and Wyndham to be utilized by all hotel staff.

28.

Pursuant to the Franchisor Contracts, DIW and Wyndham reserve the right to discontinue and terminate their relationship with Lincoln Hotels if DIW and Wyndham determine that the Days Inn does not meet their quality standards, as measured by routine quality assurance inspections performed by DIW and Wyndham.

29.

DIW and Wyndham require their franchisees, including Lincoln Hotels, to purchase subscriptions to one of two central reservation platforms that control the

most important aspects of the day-to-day operation of the Days Inn. These systems, controlled by DIW and Wyndham, book reservations, perform check-in and check-out functions, manage rates and room inventory, collect and transmit data from guests to DIW and Wyndham, automate the front desk and operational record keeping of the hotel, and communicate with other electronic systems Lincoln Hotels is required to use by DIW and Wyndham. There are no functions more essential to the day-to-day operations of the Days Inn than the booking of rooms for money, which is controlled entirely by DIW and Wyndham through these mandatory programs.

30.

Wyndham exerts control over the Days Inn's security operations and requires employees of the Days Inn to send Wyndham incident reports whenever a security incident, including arrests, occurs at the property.

31.

Wyndham maintains an extensive Online Reputation Management System that closely monitors and scrutinizes social media references, online reviews, complaints, news reports, and other references to its hotels, including the Days Inn, in real time. Through this system, utilizing third party companies such as Medallia, Inc., Wyndham monitors all publicly-available reviews of the Days Inn, receives

11

customer surveys and complaints directly, manages feedback from those communications, and monitors safety threats, police reports, and news articles involving the Days Inn. Wyndham analyzes this data and delivers analysis, feedback, direction, and ultimatums to hotels and franchisees daily. For example, Wyndham gave Lincoln Hotels a time limit to have its employees respond to online complaints or face a fine.

32.

Wyndham uses its Online Reputation Management System to exert substantial control over franchisees and hotel locations. This 24-hour scrutiny of online reviews, surveys, and complaints has resulted in Wyndham revoking its brands from roughly 80,000 rooms nationwide after finding the hotels did not meet Wyndham's standards. In other words, Wyndham receives daily information about the operation of the ventures it is a part of and Wyndham may choose to no longer profit from those ventures.

33.

DIW also monitors all publicly-available reviews of the Days Inn, receives customer surveys and complaints directly, and monitors safety threats, police reports, and news reports involving the Days Inn.

34.

Through the booking and reservation systems and their online reputation management programs, DIW and Wyndham are able to increase or decrease the revenue of the Days Inn by promoting or not promoting the hotel more or less than other Wyndham properties in the area.  These systems are both a carrot and a stick that DIW and Wyndham use to control the day-to-day operation of the Days Inn. DIW and Wyndham require Lincoln Hotels to utilize their reservation systems and dictate which credit cards Lincoln Hotels can accept.  Lincoln Hotels cannot use any other reservation system, booking engine or other technology. DIW and Wyndham jointly own all information collected on the guests at the Days Inn.

35.

Based upon the factual assertions outlined in paragraphs 12-34 and throughout this Complaint, DIW and Wyndham are directly and vicariously liable for the acts and negligence of Lincoln Hotels as discussed herein.

36.

All Defendants are directly and vicariously liable for the acts and negligence of Lincoln Hotels' agents and employees and discussed herein.

37.

Whenever reference is made in this complaint to any act, deed, or conduct of a Defendant, the allegation is that the Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

## SEX TRAFFICKING ALLEGATIONS

38.

Minor sex trafficking includes recruiting, enticing, harboring, transporting, obtaining, maintaining, patronizing, or soliciting a person for a commercial sex act who is under the age of 18.  18 U.S.C. § 1591(a), *et seq*.  Plaintiff was a victim of minor sex trafficking at Defendants' hotel at all times relevant to this Complaint.

39.

Defendants knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

40.

Defendants knew or should have known, at least by 2014, that Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at Defendants' hotels.  According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country.  In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.

41.

Without a venue, or crime scene, a sex trafficking venture ceases to exist. Defendants, for a fee, provided the crime scene, a private and anonymous venue for the minor C.D. to be sold for sex at their hotel.

42.

Hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

43.

Plaintiff was trafficked for sex at the Days Inn, where she was an invitee, on multiple visits during the month of August, including between August 17–20, 2018.

44.

Plaintiff's sex traffickers operated openly and brazenly at the Days Inn. C.D.'s traffickers openly "recruited" other minors on the Days Inn premises and forced them into sex trafficking at the Days Inn.

45.

There is no dispute that Plaintiff was sex trafficked at the Days Inn.  Two of the individuals who trafficked Plaintiff at the Days Inn were arrested and pled guilty to sex trafficking at the Days Inn.

46.

While she was trafficked at the Days Inn, Plaintiff exhibited numerous well-known and visible signs of a minor sex trafficking victim in the common areas, of which Defendants knew or should have known, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control

by her traffickers, including two older men.

47.

While she was trafficked at the Days Inn, Plaintiff's rooms evidenced numerous well-known and visible signs of sex trafficking of which Defendants knew or should have known. The police found two Trojan condom boxes and three used condoms in the room Plaintiff was trafficked in. The rooms also contained over $1,200 in cash, multiple cell phones, a .380 pistol magazine, and a Glock pistol cleaning brush.

48.

While Plaintiff was trafficked at the Days Inn, many older men visited the sex traffickers' rooms each day, each for short periods of time. Defendants knew or should have known that the number of daily, older male visitors to the room was obviously indicative of minor sex trafficking, and Defendants negligently failed to control or monitor the frequent male visitors.

49.

While Plaintiff was trafficked at the Days Inn, several other victims were also trafficked for sex at the hotel. As a result, a large number of buyers frequented the hotel each day.

50.

Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing.

51.

Defendants rented one of the rooms that Plaintiff was trafficked in at the Days Inn to Plaintiff, a minor, without requiring identification.

52.

Plaintiff interacted with the hotel staff and managers at the Days Inn, who knew or should have known Plaintiff was a minor victim of sex trafficking occurring at the Days Inn.

53.

Plaintiff's traffickers frequently visited the front desk of the Days Inn and interacted with hotel employees and management while buyers were in the room having sex with Plaintiff. and another minor sex trafficking victim.

54.

Employees at the Days Inn accommodated and were familiar with Plaintiff's traffickers, due to their having stayed at the Days Inn while trafficking other minor victims there in the months preceding the sex trafficking of Plaintiff.

55.

Defendants knew or should have known that the Days Inn was utilized for

sex trafficking as Defendants, at all relevant times, kept a vending machine

prominently located in the Days Inn lobby and directly across from the front desk

stocked with hundreds of condoms.  The vending machine and the hundreds of

condoms contained within it for sale by the Days Inn were plainly visible to DIW

and Wyndham's inspectors.  As specific evidence, the vending machine located in

the lobby of the Days Inn in which Plaintiff was trafficked appears as follows:



19

56.

DIW and Wyndham's system standards control in detail the operation of the vending area at the Days Inn.  Three separate sections of the systems standards manual control "Vending Area Size & Location," "Vending Area Operational Standards," and "Vending Machine Area – Design." Further, DIW and Wyndham require Lincoln Hotels to obtain their express permission before adding amenities and services at the Days Inn.

57.

Through the Worldwide Sourcing Solutions Approved Supplier program, DIW and Wyndham control how Lincoln Hotels spends its money and what Lincoln Hotels may purchase.  DIW and Wyndham require Lincoln Hotels to purchase an array of supplies only from its "Approved Suppliers," from whom DIW and Wyndham receive commission payments.  DIW and Wyndham negotiate the price, terms, discounts, and commissions Lincoln Hotels will receive on the purchase of furniture, supplies, and amenities essential to the daily operation of the Days Inn.

58.

Pursuant to DIW and Wyndham's system standards and the applicable franchise agreement, DIW and Wyndham performed unannounced and sometimes

anonymous inspections of the Days Inn property, operations, and records at least annually to ensure the property was maintained according to DIW and Wyndham's standards, including the operation of the vending and other areas. DIW and Wyndham's policies dictate that problem hotels were inspected more frequently. The multiple high-profile child sex trafficking incidents at the Days Inn identified Days Inn as a problem hotel that warranted frequent inspection. The child sex trafficking activity at the Days Inn was apparent to DIW and Wyndham's inspectors.

59.

DIW and Wyndham consented to and ratified the sale of condoms in the vending area at the Days Inn after they knew or should have known the hotel was a frequent venue for child sex trafficking.

60.

Managers and employees at the Days Inn visited the rooms used for Plaintiff's sex trafficking, and at times bought drugs from Plaintiff's traffickers.

61.

Employees, including management, at the Days Inn acted as lookouts for Plaintiff's sex traffickers and kept Plaintiff's sex traffickers informed of police activity at the hotel.

62.

The Days Inn and its approaches were well known for crime, prostitution, and minor sex trafficking. Surrounding businesses hired security guards to protect their employees while entering and exiting buildings. Security guards at a nearby office building observed rampant prostitution at the Days Inn and frequently saw multiple scantily dressed young women roaming the outdoor halls. The security guards witnessed a steady stream of cars coming to the hotel, with men going to the rooms and leaving after a short period of time.

63.

Upon information and belief, when buyer traffic to the room was too busy, employees and managers at the Days Inn moved Plaintiff to a room in a less visible location in the hotel so that the sex trafficking venture could continue.

64.

Plaintiff's traffickers carried handguns throughout the duration of her trafficking.  On August 20, 2018, another minor victim of sex trafficking at Defendants' premises escaped from Plaintiff's traffickers and called the police. Later that morning, multiple police cars arrived at the Days Inn. However, to further the sex trafficking enterprise and its benefits, employees of the Days Inn called the room that Plaintiff was trafficked in and informed the traffickers not to

leave the room because police were in the parking lot.

65.

Despite these efforts by Days Inn employees to conceal Plaintiff's traffickers, some of Plaintiff's sex traffickers were arrested on August 20, 2018 in their room at the Days Inn.

66.

Plaintiff's sex trafficking was not the first well-known and widely-reported incident relating to minor sex trafficking at the Days Inn. Defendants knew or should have known of other minor sex trafficking and sex crimes at the hotel just months before Plaintiff was trafficked for sex at the Days Inn. Specifically, and based on publicly available information and police reports, Defendants knew or should have known of the following sex crimes, among others, occurring on their premises and approaches:

a) On or about March 18, 2017, in room 145 of the Days Inn, a sex trafficker placed a sex trafficking victim on her knees with her head over a full bathtub and told her he was going to kill her as he stood over her with a gun. The trafficker then punched the victim several times and beat her with the gun. The victim ran into the lobby and asked the employee to call the police. She then locked herself in the lobby bathroom. After

the police interviewed the victim, the officer asked the Days Inn clerk if he could identify the trafficker.  The clerk positively identified the trafficker and told the police he was familiar with the trafficker due to his previous stays at the Days Inn.

b)  On or about June 13, 2017, a well-known prostitute who lived in room 101 at the Days Inn was arrested in her room.

c)  On or about October 13, 2017, two men were arrested at and near the Days Inn in an undercover sting for attempting to meet minors for sex. One man arranged to meet what he thought was a 14-year old *in the lobby of the Days Inn*, where the man was arrested.  This incident was widely reported at the time and DIW and Wyndham knew or should have known of this incident as a result of their online reputation management programs tracking references to the Days Inn, the reporting of the incident to DIW and Wyndham by Lincoln Hotels as required by the operational documents, and widespread news reports.

d)  On or about January 7, 2018, a prostitute was arrested in her room at the Days Inn.

e)  On or about March 7, 2018, two different sex traffickers were arrested at the Days Inn for trafficking three women, including two minor children,

out of room 236 at the Days Inn. This incident was widely reported at the time and DIW and Wyndham knew or should have known of this incident as a result of their online reputation management programs tracking references to the Days Inn, the reporting of the incident to DIW and Wyndham by Lincoln Hotels as required by the operational documents, and widespread news reports.

67.

DIW and Wyndham require Lincoln Hotels to send all crime and incident reports concerning the property directly to DIW and Wyndham. All Defendants knew or should have known of sex trafficking and other criminal activity existing at the Days Inn prior to Plaintiff's sex trafficking.

68.

Defendants had actual and constructive knowledge of sex trafficking and other criminal activity existing on the property and in the surrounding area prior to Plaintiff's sex trafficking. Defendants knew or should have known of violent crimes occurring on their premises and approaches.

69.

Defendants had actual or constructive knowledge of publicly available online reviews of the Days Inn reporting widespread prostitution and crime occurring at the hotel.

70.

Defendants knew or should have known of a June 2014 review stating:

> **NOT SAFE!** . . . We arrived to see what looked to be 2 prostitutes coming out of a room and people serving as lookouts on the second floor. . . . "Couples" walking around towards the trees. Doesn't take a genius to figure out what was going on.

A response to this review was posted by "KanaHotelGroup, Manager at Days Inn by Wyndham Marietta-Atlanta-Delk Road."

71.

Defendants knew or should have known of a July 2014 review stating:

> **The most disgusting hotel I've ever stayed in** . . . prostitutes, drug deals, doors broken, stairwells had metal debris to trip over the list goes on and on[.]

A response to this review was posted by "KanaHotelGroup, Manager at Days Inn by Wyndham Marietta-Atlanta-Delk Road."

72.

Defendants knew or should have known of a September 2014 review stating:

> **TERRIBLE I WILL NOT RETURN!!!!** . . . This is a very bad location. I seen alot of drug dealers an prostitutes there. I will #NEVER go back to this location. If you want to be safe then sorry then DON'T go to this HOTEL.

A response to this review was posted by "KanaHotelGroup, Manager at Days Inn by Wyndham Marietta-Atlanta-Delk Road."

73.

Defendants knew or should have known of a November 2017 review stating:

> **Run Down & Creepy** . . . This Motel was a mess. . . . There were teenagers who seemed to just live there all week long without going to school. The location appears to be a nice area with this property dragging the neighborhood down. Would recommend this hotel for someone seeking a location to meet a prostitute.

74.

DIW and Wyndham knew or should have known of these and other reviews because of the monitoring referenced above, but also because Wyndham and DIW published such online reviews on their own website, www.wyndhamhotels.com.

75.

As a direct and proximate result of Defendants' acts and omissions, C.D. suffered substantial physical, emotional, and psychological harm and other damages.

27

## COUNT I
## NEGLIGENCE ALLEGATIONS

76.

Plaintiff incorporates Paragraphs 1 through 75 as if fully restated herein verbatim.

77.

Defendants knew or should have known the steps to take to prevent the Days Inn from being used as a venue for C.D.'s minor sex trafficking.

78.

Defendants knew or should have known of the Tourism Child-Protection Code of Conduct (hereinafter "the Code") and negligently failed to implement appropriate steps to prevent child sex trafficking at the Days Inn, such as:

a) establishing corporate policies and procedures against sexual exploitation of children;

b) training employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c) including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

28

d) providing information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e) supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

f) reporting annually on the company's implementation of Code-related activities.

79.

In 2011, Wyndham's predecessor entity, Wyndham Worldwide Corporation, signed the Code, as referenced in paragraph 78. However, as shown by the acceptance of domestic minor sex trafficking at the Days Inn, Wyndham negligently failed to appropriately follow and implement these basic sex trafficking prevention rules and guidelines.

80.

Defendants negligently failed to train their employees, managers, and agents on the Department of Homeland Security ("DHS") guidelines to identify warning signs that indicate the presence of sex trafficking on the hotel premises such as:

a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b) persons who lack freedom of movement or are constantly monitored;

29

c)      persons who have no control over or possession of money or ID;

d)      persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e)      requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f)      the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g)      extended stay with few or no personal possessions in the room;

h)      excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i)      the same person reserves multiple rooms;

j)      a room is rented hourly, less than a day, or for an atypical extended stay;

k)      attempts to sell items to or beg from patrons or staff;

l)      cars in the parking lot regularly parked backward, so the license plates are not visible;

m)      loitering and solicitation of male patrons;

n)      waiting at a table or bar and picked up by a male (trafficker or customer);

o)      persons asking staff or patrons for food or money; and

p)      persons taking cash or receipts left on tables.

81.

In spite of their knowledge about the illegal activity at the Days Inn, including multiple reports and arrests related to minor sex trafficking and other sex crimes in the twelve months prior to Plaintiff's trafficking, Defendants negligently failed to implement any measures to protect their invitees, including Plaintiff, from becoming victims of sex trafficking at the Days Inn and continued their venture to profit from the operation of the Days Inn and the minor sex trafficking incorporated into the Days Inn's daily operations.

82.

Defendants negligently failed to implement policies and procedures to prevent, identify, and deter sex trafficking in their hotels and to ensure they were not profiting from sex trafficking, as required by the TVPRA and other federal law.

83.

At all relevant times, Defendants controlled the operation and management of the Days Inn and had the legal duty to keep the premises in a state consistent with due regard for the safety of their invitees, including Plaintiff. Defendants breached said duty and failed to act as similarly situated businesses would in like

circumstances.

84.

Prior to and including the time when Plaintiff was trafficked at the Days Inn, Defendants negligently maintained, inspected, secured, patrolled, and managed the Days Inn. Defendants had knowledge, both actual and constructive, of the need to properly maintain, secure, inspect, patrol, and manage the premises, but negligently failed to exercise ordinary care, thereby creating an unreasonable risk of injury to invitees, including Plaintiff.

85.

Defendants had actual and constructive knowledge of the dangerous and hazardous conditions existing at the Days Inn due to the knowledge of their employees and agents and due to the prior criminal activity and dangers associated with the property and surrounding high crime area.

86.

Plaintiff's sex trafficking was foreseeable to Defendants because they knew or should have known about the actual events with Plaintiff, as well as the history of minor sex trafficking at the Days Inn and other hotels in the area and the history of criminal activity at and around the Days Inn and in the surrounding high-crime area. Thus, Defendants owed a duty to invitees like Plaintiff to exercise ordinary

care in keeping the premises and approaches safe from criminal activity, especially minor sex trafficking.

87.

Defendants breached the duty owed to Plaintiff by failing to exercise ordinary care to keep their premises safe and negligently permitting criminal activity, especially minor sex trafficking, to exist and remain at the Days Inn.

88.

Defendants knew of, or in the exercise of ordinary care, should have known of the dangerous and hazardous conditions existing on the premises, and the failure to maintain, inspect, secure, patrol, and manage the premises, and that these conditions were likely to, and did, result in minor sex trafficking previously at the Days Inn and again to Plaintiff.

89.

Defendants had actual and constructive knowledge of criminal activity, including minor sex trafficking, at and around the Days Inn prior to Plaintiff's minor sex trafficking.

90.

Despite their actual and constructive knowledge of criminal activity, including minor sex trafficking, Defendants negligently failed to protect invitees, including Plaintiff, from the risks of minor sex trafficking and other violent crimes.

91.

Despite their actual and constructive knowledge of criminal activity, Defendants negligently failed to warn Plaintiff or other invitees of the dangers at and around the Days Inn.

92.

Despite their actual and constructive knowledge of minor sex trafficking and other criminal activity, Defendants negligently failed to maintain adequate security devices and personnel to permit proper use of the property, thereby causing an unreasonable risk of injury to invitees, including Plaintiff.

93.

Despite their actual and constructive knowledge of minor sex trafficking and other criminal activity, Defendants negligently failed to maintain policies, procedures, or systems of investigating, reporting and warning of minor sex trafficking and other crimes, and negligently maintained the Days Inn.

94.

Despite their actual and constructive knowledge of criminal activity, Defendants failed to take appropriate action to remedy or reduce the danger to their invitees and allowed the dangerous environment at the Days Inn to worsen and continue to exist unabated, thereby creating a nuisance.

95.

Because Defendants had knowledge of, or in the exercise of reasonable care should have had knowledge of the dangerous environment at and around the subject premises, Defendants are liable for the negligent supervision, hiring, training, and retention of their employees and the entrustment of said property to their agents and employees. Said negligence proximately caused the damages and injuries to Plaintiff.

96.

Defendants negligently represented to invitees that the Days Inn was properly maintained and that the property was safe.

97.

Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways, to-wit:

a)      Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary

care to keep the premises safe;

b)   Negligently failing to keep the premises in a state of good repair;

c)   Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

d)   Negligently failing to provide appropriate and effective security personnel during Plaintiff's minor sex trafficking at the hotel;

e)   Negligently failing to properly inspect and maintain the premises;

f)   Negligently failing to properly train and supervise their employees regarding minor sex trafficking at the hotel;

g)   Negligently failing to properly retain, hire, train, and supervise said employees;

h)   Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

i)   Negligently failing to respond to online reviews and publicly available information;

j)   Negligently failing to prevent loitering and trespassing;

k)   Negligently failing to remove loiterers and trespassers;

l)   Negligently failing to inspect, patrol, or appropriately monitor the property;

m)    Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

n)    Negligently failing to remediate a long history of crime at the Days Inn and the area nearby;

o)    Negligently failing to warn invitees of known hazards at the property; and

p)    Negligently representing to invitees that the property was safe.

98.

Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendants and one or more or all above stated acts were the proximate causes of the injuries sustained by Plaintiff. Defendants are liable for C.D.'s injuries sustained, pain and suffering, the expenses of treatment and all other elements of damages allowed under the laws of the State of Georgia, including all special, compensatory, incidental, consequential, economic, and punitive damages.

37

99.

Defendants are liable for the domestic minor sex trafficking of Plaintiff.

100.

Defendants' negligence discussed in this count was a cause in fact and a proximate cause of Plaintiff's substantial physical, emotional, and psychological harm and other damages.

## COUNT II
## STATUTORY LIABILITY
## 18 U.S.C. § 1595

101.

Plaintiff incorporates Paragraphs 1 through 100 as if fully restated herein verbatim.

102.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

103.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving a percentage of the revenue generated by the operation of the Days Inn,

including a percentage of the revenue generated for the rate charged on the rooms in which Plaintiff was trafficked.

104.

Defendants participated in a sex trafficking venture by providing to Plaintiff's traffickers the necessary venue for Plaintiff's minor sex trafficking.  In the course of this venture, multiple men paid to have sex with seventeen-year-old C.D. at the Days Inn.

105.

The venture in which Defendants participated was in or affecting interstate commerce.

106.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants, their agents and representatives, had the opportunity to observe Plaintiff, a minor, at the hotel, with and without her traffickers, the signs of minor sex trafficking exhibited by Plaintiff, her traffickers, and the rooms in which she was trafficked, and the frequent traffic of adult male buyers to the minor C.D.'s rooms.

107.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants, their agents and representatives knew or should have known of other minor sex trafficking and sex crimes at the hotel just months before Plaintiff was trafficked for sex at the Days Inn.

108.

Defendants are directly and vicariously liable under § 1595(a) for the actions of their agents and representatives.

109.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this sex trafficking venture.

110.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

111.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused

by the acts discussed in this count.

## **DAMAGES**

### 112.

Plaintiff incorporates Paragraphs 1 through 111 as if fully restated herein verbatim.

### 113.

As a proximate and foreseeable result of the Defendants' negligence and violations of the TVPRA, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial.  Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a)   Personal injuries;

b)   Past, present and future conscious pain and suffering;

c)      Loss of enjoyment of life;

d)      Medical expenses;

e)      Mental anguish and emotional distress;

f)      Loss of past, present, and future wages;

g)      Incidental expenses;

h)      All special, compensatory, economic, punitive, and other damages permissible under Georgia law and Federal law; and

i)      Consequential damages to be proven at trial.

114.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

115.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action.  (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)).  Furthermore, Plaintiff is entitled to all

expenses of litigation and attorneys' fees pursuant to all other Federal and Georgia statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a)   Process issue as provided by law;

b)   Plaintiff be awarded actual damages in amounts to be shown at trial from the Defendants;

c)   Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d)   Plaintiff be awarded a trial by jury; and

e)   Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 12th day of August, 2020.

*[signatures on following page].*

43

Respectfully submitted,

**LAW & MORAN**

/s/ Peter A. Law
Peter A. Law
Georgia Bar No. 439655
pete@lawmoran.com
E. Michael Moran
Georgia Bar No. 521602
mike@lawmoran.com
Denise D. Hoying
Georgia Bar No. 236494
denise@lawmoran.com
Attorneys for Plaintiff

**LAW & MORAN**
563 Spring Street, NW
Atlanta, Georgia 30308
Phone: (404) 814-3700
Facsimile: (404) 842-7710

**ANDERSEN, TATE & CARR, P.C.**

/s/ Patrick J. McDonough
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Attorneys for Plaintiff

**ANDERSEN, TATE & CARR, P.C.**
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing *Complaint for Damages* has been

prepared with one of the following font and point selections approved by the Court

in LR 5.1., NDGA.  Specifically, the above-mentioned pleading was prepared

using Times New Roman font of 14 point size.

Respectfully submitted,

**LAW & MORAN**

<u>/s/ Peter A. Law</u>
Peter A. Law
Georgia Bar No. 439655
pete@lawmoran.com
E. Michael Moran
Georgia Bar No. 521602
mike@lawmoran.com
Denise D. Hoying
Georgia Bar No. 236494
denise@lawmoran.com
Attorneys for Plaintiff

**LAW & MORAN**
563 Spring Street, NW
Atlanta, Georgia 30308
Phone: (404) 814-3700
Facsimile: (404) 842-7710